# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| LA'SHON BODDIE,<br><br>      *Plaintiff,*<br><br>**v.**<br><br>**Officer COII DAVID SALDANA and**<br>**Sergeant PHILIP WILLIAMSON,**<br><br>      *Defendants.* | **CIVIL ACTION NO.**<br>**5:19-cv-00027-TES-CHW** |

## ORDER ADOPTING AND MODIFYING THE UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a counseled civil case[1] in which Plaintiff La'Shon Boddie asserts Eighth

Amendment claims under 42 U.S.C. § 1983. Plaintiff alleges that Defendants Officer

David Saldana and Sergeant Philip Williamson failed to protect him from his cellmate,

Yamil Torres, and that Defendant Saldana was deliberately indifferent to Plaintiff's

serious medical needs following Torres' assault. Defendants Saldana and Williamson

filed a Motion for Summary Judgment [Doc. 80] and Plaintiff filed a Response [Doc. 82]

and Sur-Reply [Doc. 87] in opposition. Now, before the Court is the United States

Magistrate Judge's Report and Recommendation ("R&R") [Doc. 88] on Defendants'

summary-judgment motion and Plaintiff's Objection [Doc. 90] with an "attached brief."

---

[1] Plaintiff initiated this case as a pro se litigant; however, before Defendants filed their summary-judgment motion, he retained counsel. [Doc. 1]; [Doc. 69].

[Doc. 90, p. 1]; *see generally* [Doc. 90-1]. For the reasons set forth below, the Court

**ADOPTS** and **MODIFIES** the United States Magistrate Judge's R&R and, as a result,

**GRANTS** Defendants' summary-judgment motion over Plaintiff's objections.

### A.    Standards of Review

#### 1.    28 U.S.C. § 636

Section 636 of Title 28 from the United States Code states that after the magistrate

judge files his proposed findings and recommendations, "any party may serve and file

written objections to such proposed findings and recommendations as provided by

rules of court[]" and that "[a] judge of the court shall make a de novo determination of

those portions of the report or specified proposed findings or recommendations to

which objection is made." 28 U.S.C. § 636(b)(1)(C). "A judge of the court may accept,

reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge." *Id.*

#### 2.    Summary-Judgment Standard

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on

the evidence presented, "'a reasonable jury could return a verdict for the nonmoving

party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002)

(quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991));

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[2] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d

---

[2] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible

inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

## B.    Failure to Protect

The gist[3] of Plaintiff's failure-to-protect claim is that around 3:00 – 6:00 a.m. on March 12, 2018, he awoke to his cellmate, Torres, beating him in the head with a ceramic food tray. [Doc. 88, pp. 1–2]; *see, e.g.,* [Doc. 80-4, Saldana Depo., pp. 13:6, 50:11–12]. As a result of the altercation, Plaintiff and Torres suffered injuries for which both of them were taken for medical treatment. [Doc. 88, p. 2]. Plaintiff, however, was taken for treatment much later. In addition to Plaintiff's head and arm injuries, his knee was swollen, and his ear was bleeding. [*Id.*]; [Doc. 80-3, Boddie Depo., p. 44:11–15]; [Doc. 83-2, Boddie Aff., ¶ 3]. Plaintiff claims that prior to this altercation, he had asked prison officials—on five[4] different occasions—to separate him from Torres because they didn't "get along anymore."[5] [Doc. 88, pp. 1–2]; [Doc. 80-4, Saldana Depo., pp. 13:6, 50:11–12].

At summary judgment, Defendants argued that even assuming Torres posed a substantial risk of serious harm to Plaintiff, the evidence could not lead a rational trier

---

[3] In his R&R, the magistrate judge provides a detailed account of the underlying facts in this action. [Doc. 88, pp. 1–4].

[4] The Court only discusses the occasions that concerned Defendants Saldana and Williamson.

[5] According to Defendant Saldana's deposition, "Torres" also "wanted to go to another room[.]" [Doc. 80-4, Saldana Depo., p. 50:12–13].

of fact to find that Defendants were subjectively aware of that risk. [Doc. 80-1, p. 8].

Obviously, Plaintiff's failure-to-protect claim stems from the confines of the Eighth

Amendment's prohibition on cruel and unusual punishments—Defendants' alleged

failure to protect him from his cellmate. The parties and the magistrate judge all present

accurate representations of current precedent surrounding this area of law—qualified

immunity included. The only contention, of course, is how the magistrate judge applied

that law *to* the facts of this case. And although the parties already agree on the

applicable law, the Court presents it once more so that Plaintiff's claims can be fully-

addressed in light of his objections.

"The defense of qualified immunity completely protects government officials

performing discretionary[6] functions from suit in their individual capacities unless their

conduct violates 'clearly[-]established statutory or constitutional rights of which a

reasonable person would have known.'" *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th

Cir. 2019) (citation omitted); [Doc. 80-1, pp. 10–11]; [Doc. 80-3, Boddie Depo., pp.

15:25—16:2 (confirming that Plaintiff brings suit against both Defendants in their

individual capacities)]. This defense will bar a plaintiff's claims "'unless, at the time of

the incident, "the preexisting law dictates, that is, truly compel[s]" the conclusion for all

reasonable, similarly situated public officials' that the defendants' actions violated the

---

[6] *See Shivers v. United States*, --- F.3d. ----, 2021 WL 2350871, at *3 (11th Cir. 2021) (discussing that inmate housing-placement decisions "fall squarely" within the realm of discretionary functions of prison officials).

plaintiff's federal rights." *Washington v. Warden*, 847 F. App'x 734, 737 (11th Cir. 2021). Since neither party disputes that Defendants acted within the scope of their discretionary authority as prison officials, Plaintiff must show that Defendants violated a constitutional right and that the right was clearly established at the time of the alleged violation. *Id.* (citing *Marbury*, 936 F.3d at 1232); *see also* [Doc. 88, p. 11]. "For a right to be clearly established, the plaintiff may either identify precedents with materially similar facts or show that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional." *Washington*, 847 F. App'x at 737 (citations omitted).

First, the United States Supreme Court has recognized that "[t]hough prison conditions may be harsh, 'gratuitously allowing the beating . . . of one prisoner by another serves no "legitimate penological objective."'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). Assaults in prison are not "part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 834 (citation omitted). And in this case, no one disputes that prison officials have a duty to protect prisoners from violence at the hands of other prisoners and that a prison official's deliberate indifference to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828, 833 (citation omitted). That said, "it is not . . . every injury suffered by one prisoner at the hands of another that translates into *constitutional* liability for prison officials responsible for the victim's safety." *Id.* at 834 (emphasis

added). Instead, it is "only the unnecessary and wanton infliction of pain [that] implicates the Eighth Amendment[.]" *Washington*, 847 F. App'x at 737 (citation omitted).

To establish a § 1983 claim for deliberate indifference based on failure to prevent harm, the prisoner must first "show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citation omitted). Second, "a prison official must have a 'sufficiently culpable state of mind' . . . one of 'deliberate indifference' to [the prisoner's] health or safety[.]" *Id.* (citations omitted). Even if an Eighth Amendment violation is shown, the prisoner must also be able to demonstrate "causation" between the alleged violation and the prison official's conduct. *Marbury*, 936 F.3d at 1233. "In short, to survive summary judgment on a deliberate indifference failure-to-protect claim, Plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) Defendants' deliberate indifference to that risk; and (3) causation." *Washington v. Taylor*, No. 5:19-cv-00178-TES, 2020 WL 4760143, at *5 (M.D. Ga. Aug. 17, 2020) (cleaned up), *aff'd*, 847 F. App'x 734; *see also Mosley v. Zachary*, 966 F.3d 1265, 1270 (11th Cir. 2020).

Although courts may begin the qualified immunity inquiry "with either the constitutional question or the question of whether the violation was clearly established, the Supreme Court has admonished [courts] to 'think hard, and then think again' before addressing the merits of the constitutional claim." *Washington*, 847 F. App'x at 737 (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 n.7 (2018)). Thus, with respect to

8

Plaintiff's failure-to-protect claim against Defendant Saldana, and then for Defendant Williamson, the Court begins with an analysis of whether the alleged constitutional violations were contrary to clearly-established law.

### 1. Defendant Saldana

Defendant Saldana testified that he and Plaintiff had "only [one] conversation" whereby Plaintiff "inform[ed] [him] that [he and Torres] didn't get along anymore" and that they were "having a situation" in their cell.[7] [Doc. 80-4, Saldana Depo., p. 50:11–12]; [Doc. 80-3, Boddie Depo., p. 16:18]. This conversation took place on March 12, 2018, at 2:10 a.m., just before Torres assaulted Plaintiff with the food tray. [Doc. 80-4, Saldana Depo., p. 50:9–10]; [Doc. 1, p. 8]. According to Plaintiff's account of what happened next, Defendant Saldana (as requested) "said he notified . . . his supervisor" of their conversation. [Doc. 80-3, Boddie Depo., p. 16:19].

In the Eleventh Circuit, "[a] prisoner usually must communicate some reason beyond the mere existence of a threat that could permit prison officials to conclude that

---

[7] Plaintiff's deposition testimony confirms Defendant Saldana's factual account about their conversation. The specifics of this conversation appear to be that Plaintiff instructed Defendant Saldana to "notify [his supervisor] about [Plaintiff and Torres'] current situation." [Doc. 80-3, Boddie Depo., p. 33:17–22]. According to Plaintiff, he "[b]asically" just asked if Defendant Saldana could call his supervisor and tell him that Plaintiff and Torres were having problems. [*Id.*]. Based on the logbooks, Defendant Saldana did as requested. [*Id.* at pp. 33:25—34:3, 55:22—56:9].

Also, in his response brief opposing Defendants' summary-judgment motion, Plaintiff argues that he also told Defendant Saldana that he "fear[ed] for his safety." [Doc. 80-3, Boddie Depo., p. 31:19–23]. In keeping with the summary-judgment standard applicable to the Court's review of the magistrate judge's R&R, it will make the justifiable inference in Plaintiff's favor as the nonmovant. [Doc. 88, p. 5 (citing *Tolan v. Cotton*, 572 U.S. 650, 657 (2014))]; *Anderson*, 477 U.S. at 255. Accordingly, the Court accepts Plaintiff's allegation that he told Defendant Saldana that he feared for his safety as fact. *Sconiers*, 946 F.3d at 1263.

a particular threat was substantial[.]" *Washington*, 847 F. App'x at 736. Giving all justifiable inferences to Plaintiff at the summary-judgment stage, Defendant Saldana knew that: (1) Plaintiff and Torres didn't "get along anymore"; (2) Plaintiff and Torres were "having a situation"; and (3) that Plaintiff feared for his safety. *Anderson*, 477 U.S. at 255. *See* n.7, *supra*. As the magistrate judge discussed, such general awareness falls far below what is required in the Eleventh Circuit. [Doc. 88, pp. 7–8]. "[B]efore a defendant's awareness rises to a sufficient level of culpability, there must be much more than mere awareness of an inmate's generally problematic nature." *McBride v. Rivers*, 170 F. App'x 648, 655 (11th Cir. 2006). Just like the plaintiff in *McBride v. Rivers*, Plaintiff does not "identify a specific prior incident[] from which [Defendant Saldana] could infer that a substantial risk existed." *Id.* Based on what Plaintiff said to Defendant Saldana and what he asked of him, "not every reasonable officer would have known that under [current] precedents, the risk of harm to [Plaintiff] was substantial—as opposed to a mere possibility." *Washington*, 847 F. App'x at 737–38.

Nothing that Defendant Saldana knew was sufficient to impart a subjective awareness within him to infer that Plaintiff faced a substantial risk of *serious* harm. *Mosley*, 966 F.3d at 1270–71 (discussing the subjective and objective components of deliberate indifference and noting that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists[] and [that] he must also draw the inference"). There is no evidence that Plaintiff told

Defendant Saldana that Torres had "threatened him directly," and even if Torres had threatened Plaintiff directly, Plaintiff "needed to provide [Defendant Saldana] "with 'further information enabling [him] to conclude that the risk was substantial and not merely possible.'" *Washington*, 847 F. App'x at 738 (citation omitted). Without a case directly on point, Plaintiff has not shown that Defendant Saldana acted contrary to clearly-established law, thus entitling Defendant Saldana to the defense of qualified immunity. *Id.*

Moreover, even if it can be assumed (in Plaintiff's favor) that Defendant Saldana knew of a substantial risk to Plaintiff's safety based on their conversation, Plaintiff's own factual account shows that Defendant Saldana responded to the risk in an objectively reasonable manner. *Mosley*, 966 F.3d at 1271–72 (quoting *Bowen v. Warden, Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016)). Plaintiff admits that Defendant Saldana did everything he asked of him—to report Plaintiff's safety-related concerns and the "tension" between Plaintiff and Torres to his supervisor. [Doc. 80-3, Boddie Depo., p. 33:22—34:7]. Thus, Defendant Saldana was not deliberately indifferent to a substantial risk, and he "may be found free from liability . . . "even [though] the harm ultimately was not avoided." *Mosley*, 966 F.3d at 1271 (quoting *Farmer*, 511 U.S. at 844). At bottom, the factual evidence surrounding Defendant Saldana's involvement for Plaintiff's failure-to-protect claim clearly shows that Defendant Saldana is entitled to judgment as a matter of law on substantive grounds as well as qualified-immunity

grounds. Accordingly, the Court **ADOPTS** the magistrate judge's R&R with respect to his recommendation to grant summary judgment to Defendant Saldana on Plaintiff's failure-to-protect claim. [Doc. 88, pp. 7–8].

2.     Defendant Williamson

Similarly, Defendant Williamson is entitled to qualified immunity. Plaintiff says that he "notified [Defendant Williamson] of the situation firsthand[]" because he was the building sergeant. [Doc. 80-3, Boddie Depo., p. 18:1–5]. First, on March 6, 2018, Plaintiff submitted a written statement to Defendant Williamson describing the situation between him and Torres. [*Id.* at p. 18:5–8]; [Doc. 83-2, Boddie Aff., ¶ 7]; [Doc. 88, pp. 1–2]. In this written statement, Plaintiff told Defendant Williamson that he "felt like [his] life was in jeopardy in [his] cell with [his] bunkmate[,]" Torres. [Doc. 80-3, Boddie Depo., p. 18:8–10]. Plaintiff testified that he wrote the statement to "let [Defendant Williamson] know about the situation," and that Defendant Williamson "said that he was going to investigate it and . . . check into it."[8] [*Id.* at p. 18:12–16].

In short, Plaintiff says that he "broke it down" for Defendant Williamson as follows: (1) that he and Torres were "having problems"; that they were having (2)

---

[8] Apparently, just before Plaintiff gave Defendant Williamson his written statement, Plaintiff had a conversation with Defendant Williamson at his cell door. [Doc. 80-3, Boddie Depo., p. 20:18–21]. There, Plaintiff told Defendant Williamson that he and Torres "need to be separated," that Plaintiff "need[ed] to be out of this room," and that Plaintiff and his "bunkmate [were] having problems." [*Id.* at pp. 20:23—21:4]. It was, apparently, after Plaintiff had this conversation with Defendant Williamson that he gave Defendant Williamson the written statement and Defendant Williamson said that he would "check into the situation." [*Id.* at p. 21:4–6].

"difficulties in the room"; and that they (3) "couldn't live with each other." [*Id.* at pp. 21:9–11, 23:5–7]. That's all he said. [*Id.* at p. 23:8–9 (confirming that these three things were "all [Plaintiff] said" to Defendant Williamson)]; [Doc. 83-2, Boddie Aff., ¶¶ 8–9 ("The only conversation I had with [Defendant Williamson] is recreated in the previous paragraph.")]. Plaintiff even admits that he "didn't go into a lot of detail" explaining the situation to Defendant Williamson. [*Id.* at p. 25:25]. In fact, Plaintiff's testimony only goes so far as to say that he and Torres[9] told Defendant Williamson generalities such as the two of them not being able to "live together because [they] were having numerous problems." [*Id.* at pp. 25:25—26:2]; *see also Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) (holding that "much more" than mere awareness of generally problematic nature is required). "To assume," as Plaintiff suggests, that Defendant Williamson "understood . . . what was going on" based on what Plaintiff and Torres had told him— that is, Defendant Williamson "actually made the inference that" the situation between Plaintiff and Torres constituted a substantial risk of serious harm—"would assume too much." *Carter*, 352 F.3d at 1350; [Doc. 80-3, Boddie Depo., p. 21:15–23].

Next, on March 9, 2018, Plaintiff was being escorted from the shower. [Doc. 80-3, Boddie Depo., p. 31:8–9]. During this escort, Plaintiff "yelled to" Defendant Williamson "about fearing for his safety in the room" and that he "was going to file a grievance" for

---

[9] According to Plaintiff's deposition testimony, his bunkmate, Torres, "told [Defendant Williamson] the same thing." [Doc. 80-3, Boddie Depo., p. 20:4–6].

Defendant Williamson allegedly "not following" the Standard Operating Procedures in place for the Georgia Department of Corrections. [*Id.* at p. 31:8–18]; [Doc. 83-2, Boddie Aff., ¶ 8]; [Doc. 1, p. 8]. Since Plaintiff has not pointed to any caselaw that clearly establishes that a prison official's failure to separate inmates from each other based on these circumstances constitutes deliberate indifference, Defendant Williamson is entitled to the defense of qualified immunity. As the magistrate judge discussed, "the generalized nature of the threats alleged" do not invoke liability under § 1983. [Doc. 88, p. 7 (citing *Carter*, 352 F.3d at 1350)]. Accordingly, based on the defense of qualified immunity and for the substantive reasons stated in the magistrate judge's R&R, the Court also **ADOPTS** the recommendation to grant summary judgment to Defendant Williamson on Plaintiff's failure-to-protect claim. [Doc. 88, pp. 6–7, 11].

Naturally, Plaintiff argues that Defendants Saldana and Williamson should have separated Plaintiff from Torres, but "merely negligent failure to protect an inmate from attack does not justify liability" under § 1983. *Carter*, 352 F.3d at 1350 (quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)). And, of course, Plaintiff can also overcome the defense of qualified immunity if the constitutional violations were so obvious that any reasonable officer would have known that the officer's actions (or inactions) were unconstitutional, but the alleged violations in this case "were not so egregious as to vitiate qualified immunity." *Washington*, 847 F. App'x at 739.

## C.     Deliberate Indifference to Serious Medical Needs

Next, Plaintiff alleges that Defendant Saldana was deliberately indifferent to his medical needs following Torres' assault. [Doc. 1, p. 7]. The magistrate judge recommended that summary judgment should be granted on this claim as well. [Doc. 88, pp. 8–10]. However, before delving into the substantive arguments for the medical needs claim, Plaintiff raises a procedural issue with regards to how the magistrate judge reached his ultimate recommendation that summary judgment is appropriate for it. [Doc. 90-1, pp. 1–2]. Quite simply, Plaintiff argues that Defendant Saldana waived any chance of obtaining summary judgment on the medical needs claim because Defendants forgot to discuss it in their initial brief supporting their summary-judgment motion. [*Id.*]. To be clear, Defendant Saldana raised, but ultimately lost, his exhaustion-based defense with respect to Plaintiff's medical needs claim in the initial brief. But, as Plaintiff points out, nothing was to be said for substantive-based arguments against the medical needs claim. *See generally*, [Doc. 80-1]; *see also* [Doc. 88, pp. 15–16]. It wasn't until Defendants filed their Reply [Doc. 84] that Defendant Saldana, for the first time, argued that Plaintiff could not "demonstrate that [the] delay in medical treatment exacerbated his medical condition." [Doc. 84, pp. 4-5].

In his Objection, Plaintiff argues that the magistrate judge erred in allowing Defendant Saldana to raise this new "exacerbation argument" in the reply brief supporting summary judgment. [Doc. 90-1, p. 2]. Generally speaking, Plaintiff is correct.

The Eleventh Circuit has "repeatedly . . . admonished" that "arguments raised for the first time in a reply brief are not properly before a reviewing court." *Herring v. Sec'y, Dept. of Corrs.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (alteration adopted) (citing cases). However, "[t]o resolve new . . . arguments presented in a reply brief, [district] court[s] can either strike the new material or afford the [nonmovant] an opportunity to respond." *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 2:18-CV-01476-KOB, 2019 WL 4686353, at *1 (N.D. Ala. Feb. 28, 2019); *cf. Omni Health Sols., LLC v. Zurich Am. Ins. Co.*, --- F. App'x ----, 2021 WL 2025146, at *6–7 (11th Cir. 2021) (discussing when issues are timely raised for consideration by a court).

Here, the magistrate judge took the latter course of action. He relied on the fair conclusion that Plaintiff would not be prejudiced since he was given the opportunity to file a sur-reply brief to address Defendant Saldana's new merit-based argument that Plaintiff cannot show an exacerbated condition because of a delay in medical treatment. [Doc. 88, p. 4 n.1 (citing *Int'l Telecomms. Exch. Corp. v. MCI Telecomms. Corp.*, 892 F. Supp. 1520, 1531 (N.D. Ga. 1995))]; [Doc. 84, pp. 4–5]. Based on the fact that Plaintiff filed a sur-reply brief, the Court **OVERRULES** Plaintiff's objections that the magistrate judge committed error in considering the fully-briefed exacerbation argument. Accordingly, the Court will make "a de novo determination" of the parties' arguments concerning Plaintiff's medical needs claim. 28 U.S.C. § 636(b)(1)(C).

First off, deliberate indifference—from a constitutional standpoint—is a difficult standard for a prisoner to meet. *West v. Tillman*, 496 F.3d 1321, 1327 (11th Cir. 2007) (citation omitted). It "is not a constitutionalized version of common-law negligence." *Swain v. Junior*, 961 F.3d 1276, 1287–88 (11th Cir. 2020). And in order to prove deliberate indifference to a serious medical need, a prisoner shoulders three hefty burdens: (1) showing an objectively serious medical need (one diagnosed by a physician as mandating treatment or one that is so obvious and so easily recognizable that a lay person would know that a doctor's attention is needed); (2) of which the prison official was subjectively aware and disregarded (deliberate indifference); and (3) that the harm was caused by the prison official's wrongful conduct—by his deliberate indifference. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007); *see also Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009)). In addition to medical needs that are diagnosed and those that are blatantly obvious, a serious medical need, as the magistrate judge points out in light of Defendant Saldana's exacerbation argument, can also be "determined by whether a delay in treating the need worsens the condition." [Doc. 88, p. 9 (citing *Mann*, 588 F.3d at 1307)]. Because Defendant Saldana raised this exacerbation argument, the magistrate judge understandably took the same course and analyzed its merits.

After the incident with the food tray, Plaintiff testified that he asked whether Defendant Saldana could take him to medical because his ear and nose were bleeding

and because the tray left marks. [Doc. 80-3, Boddie Depo., p. 16:17—17:3]. After seeing Plaintiff's injuries, Plaintiff testified that Defendant Saldana said that he and Torres were going to "be escorted one by one." [*Id.* at p. 17:4–6]. However, when Defendant Saldana came back from escorting Torres to medical, Defendant Saldana informed Plaintiff that because his shift was about to end, he was not allowed to do anymore paperwork. [*Id.* at p. 17:6–12].

In addressing Defendant Saldana's exacerbation argument, the magistrate judge concluded: "Based on the evidence viewed in light most favorable to Plaintiff, a reasonable jury could conclude that Defendant Saldana was subjectively aware of a serious risk of harm due to Plaintiff's injuries and disregarded such a risk by refusing to escort Plaintiff to medical." [Doc. 88, p. 10]. Ostensibly, the magistrate judge conceded the first two requirements for a medical needs claim in Plaintiff's favor so that he could focus his analysis on the exacerbation-of-injury issue: Whether Plaintiff could show a worsened condition as a result of the delay in medical treatment. In the end though, the magistrate judge concluded that the evidence is insufficient to demonstrate that Defendant Saldana's refusal to escort Plaintiff to medical exacerbated his injuries. [*Id.*]. In other words, the magistrate judge agreed with Defendant Saldana that Plaintiff's medical needs claim fails at causation because he "failed to demonstrate a worsened condition due to the alleged delay in medical treatment." [*Id.* at pp. 4, 8–10]; *see also McDaniels v. Lee*, 405 F. App'x 456, 458 (11th Cir. 2010) (citing *Goebert*, 510 F.3d at 1329)

(noting that the "question of whether a delay in receiving treatment worsened [a prisoner's] condition overlaps with the causation inquiry")].

Of course, the effect that a delay in treatment can have on an injury is one way to determine its "seriousness." *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002) (noting that "[t]he 'seriousness' of an inmate's medical needs may also be decided by reference to the effect of delay in treatment"). And while it's a well-considered take on how to analyze the medical needs claim, the issue doesn't focus on whether Plaintiff "has suffered increased physical injury"—loss of hearing—"due to the delay," as Defendants have argued. *Goebert*, 510 F.3d at 1327; [Doc. 84, pp. 4–5]. Based on Plaintiff's arguments, his concern is all about timing and how quickly a prison official must see that a prisoner receives medical treatment. Albeit in only one sentence in the Complaint, Plaintiff's medical needs claim focuses on Defendant Saldana's refusal to take Plaintiff to medical because of a shift change. For a lack of better phrasing, Plaintiff's medical needs claim hinges on the fact that 33 hours and 45 minutes passed before he was given medication to alleviate the pain he felt after a fight with his cellmate. *See, e.g.*, [Doc. 83-4, p. 10].

Since the beginning, this allegation has been present in the record.[10] In the inmate-drafted Complaint, Plaintiff alleges that he was left "to suffer in unnecessary pain from his injuries." [Doc. 1, p. 8]. Defendant Saldana's exacerbation argument is slightly misfocused. But, before turning attention to the "pain" issue, the Court pauses to note that the magistrate judge's analysis on Defendant Saldana's exacerbation argument—while not the sole issue—is nonetheless correct. And even though the Court adopts that portion of the R&R, it stresses that Defendant Saldana's exacerbation argument is not the reasoning used to adjudicate the merits of Plaintiff's medical needs claim.

First, to support the exacerbation argument, Defendant Saldana argues that Plaintiff's medical needs claim turns on the *delay* of medical care as opposed to the type of medical care provided. [Doc. 88, p. 9 (quoting *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007))]. So, to the extent Plaintiff *is* actually alleging that the delay in treatment led to a worsened condition, he must show that the delay attributable to Defendant Saldana's indifference likely caused that injury—the injury being, of course, Plaintiff's subsequent hearing loss. *McDaniels*, 405 F. App'x at 458.

---

[10] Not only did Plaintiff specifically allege in his Complaint that he "suffer[ed] in unnecessary pain," the Court's preliminary review of his Complaint likewise discusses the plausibility of a deliberate-indifference claim under the purview of "unnecessary and wanton infliction of pain." [Doc. 1, p. 8]; [Doc. 6, p. 8 (quoting *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999))].

Within the R&R, the magistrate judge relied on *Hinson v. Bias*, 927 F.3d 1103 (11th Cir. 2019), a recent case from the Eleventh Circuit Court of Appeals discussing the attentiveness of prison officials in addressing prisoners' serious medical needs. Quite similar to the plaintiff in *Hinson*,[11] Plaintiff asserts that he suffered injuries to his ear followed by hearing loss. *Id.* at 1122–23. Notwithstanding the parallels of the injuries at issue in *Hinson* and Plaintiff's own, Plaintiff argues that the facts of his case are different from those discussed in *Hinson*. The Court doesn't disagree. Unlike the plaintiff in *Hinson*, Plaintiff was apparently bleeding, he never told a prison official that he was "alright," and he asked for medical assistance. *Id.* at 1122. Despite Plaintiff admitting that he "was escorted to medical" the day after the incident, he still avers that he has a viable constitutional claim because he unnecessarily suffered in pain for almost 34 hours. [Doc. 1, pp. 6, 8].

However, with respect to the exacerbation argument, Defendant Saldana points out that in the Eleventh Circuit, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *McDaniels*, 405 F. App'x at 458. Although Plaintiff put 14 pages of his prison medical file

---

[11] The plaintiff in *Hinson* alleged in his complaint that he suffered injuries to his ear which led to chronic migraines "because he did not receive necessary and timely medical treatment." 927 F.3d at 1123.

into the record, they do not verify that the delay in medical treatment was what caused his alleged loss of hearing. *See generally* [Doc. 83-4]. Here's what they say.

On March 13, 2018, at 12:45 p.m. (almost 34 hours after the incident) Plaintiff told a nurse that he had sustained a head injury, and he denied loss of consciousness, nausea, and vomiting. [*Id.* at p. 10]. The examining nurse, however, found that there was "tenderness" on Plaintiff's "posterior skull" and noted Plaintiff's complaints of pain in his left knee and right hand. [*Id.*]; *see also* [Doc. 83-4, p. 1]. As treatment, Plaintiff received 800mg of Motrin for 30 days.[12] [Doc. 83-4, pp. 1, 10]. Two days after the incident with Torres (March 14, 2018), a radiology report of Plaintiff's left knee showed that there was "no fracture, dislocation, or subluxation" and that there was "no joint effusion." [*Id.* at p. 11]. A radiology report of Plaintiff's right hand also showed "no fracture, dislocation, or subluxation" and that the alignment of the bones in his hand was "excellent." [*Id.* at p. 12]. To put it simply, despite the unfortunate pain in his left knee and right hand, the radiographs showed that they were "[n]ormal." [*Id.* at pp. 11–12].

On March 20, 2018 (eight days after the incident), Plaintiff was seen again. [*Id.* at p. 9]. During this examination, Plaintiff claimed that his "hand still hurt." [*Id.*]. The

---

[12] While the context of the following statement will become clearer below, the Court pauses to note that this is the first medical file submitted in the record to account for Plaintiff's medical treatment following the incident with Torres. [Doc. 83-4, p. 10]. Notably, it never mentions that Plaintiff's injuries were serious enough to require stitches. *See* n.13, *infra*; *see also Alsobrook*, 656 F. App'x 489 (11th Cir. 2016).

same nurse from Plaintiff's initial examination noted that he still had some "slight swelling" on his right hand, but that his "head, knee, [and] hand injur[ies]" had "improved" overall. [*Id.*]. Since Plaintiff told the nurse that the "Motrin does not help," the nurse discontinued that course of treatment and ordered 50mg of Indocin for 30 days. [*Id.*]; *see also* [Doc. 83-4, p. 1 (entry date 3/20/18 "D/C Motrin")].

On March 26, 2018 (14 days after the incident), Plaintiff was seen again (this time by a different nurse), and he stated that his ear had been bleeding. *See* [Doc. 83-4, p. 8] *in connection with* [Doc. 83-4, pp. 9–10]. The "History of Present Illness" portion of this particular medical file reflects that he "presents bleeding from [his right] ear" and that "ever since" he was "hit with a tray" it has been "real hard to hear." [Doc. 83-4, p. 8]. At this time, referral to an "Ear, Nose, and Throat" doctor (an "ENT") was "deferred pending treatment," and Plaintiff received a prescription for Augmentin to ostensibly ward off any potential ear infection. [*Id.*]; *see also* [Doc. 83-4, p. 1 (entry date 3/26/18 "Augmentin 875 mg")].

On April 10, 2018 (29 days after the incident), Plaintiff was seen again by the nurse who originally examined him. *See* [Doc. 83-4, p. 7] *in connection with* [Doc. 83-4, pp. 9–10]. During this examination, Plaintiff claimed that he still couldn't "'hear out of [his] right ear' since [his] injury" from the incident about a month ago even though he "took antibiotics" "as prescribed." [Doc. 83-4, pp. 7–8]. The "Assessment" portion of this medical file shows two very important things. First, it—like many of the others—

notes Plaintiff's claim of a decrease in hearing in his right ear. [*Id.* at p. 7]. Second, and most importantly, the medical file notes a *question* of whether Plaintiff's alleged loss of hearing was related to his injury from the incident. [*Id.* ("Rt ear ↓ hearing, ? r/t injury")]. In hopes to fully address Plaintiff's concerns for his decreased hearing, it was recommended that he receive an audiology consult. [*Id.*]; *see also* [Doc. 83-4, p. 14 (noting April 11, 2018 as the date on which the order for medical consultation was recorded)].

On May 23, 2018 (72 days after the incident), Plaintiff went for another routine medical examination. [*Id.* at p. 6]. The "History of Present Illness" portion of Plaintiff's medical file for this visit reflects his statement that he "was to see audiology and have [a] CT scan of the head for the injury he sustained during [the] fight." [*Id.*]. The results of the May 23rd examination reflect that Plaintiff was "unable to hear [a] whispered voice in [his right] ear," and he was "refer[ed] to Dr. Lift for further eval[uation]." [*Id.*].

On June 18, 2018 (98 days after the incident), Plaintiff's medical file notes that he had "[n]o pain." [*Id.* at p. 5]. Instead, this examination revealed that there was "[n]o change" in Plaintiff's problems, and his medical file notes his concern of when he was going to see an ear specialist for his right ear. [*Id.*]. This time, a third examining nurse made note of Plaintiff's loss of hearing complaints and wrote, "Will check on consult for audiology[,]" as a follow up to his concern. [*Id.*].

Lastly, a portion of Plaintiff's medical file dated April 22, 2020, shows that he had a consult with Dr. Lift. [*Id.* at p. 2]. Dr. Lift made note of "[s]ensory-neural [*sic*] hearing loss," and the rest of this portion of the medical file lists Plaintiff's then-current medications. [*Id.* at pp. 3–4]. After "numerous," almost weekly visits, Plaintiff was prescribed a hearing aid. [Doc. 80-3, Boddie Depo., pp. 44:1–4, 45:5–6].

Obviously, the Court has painstakingly culled though all 14 pages of Plaintiff's submitted medical files, and while they abundantly note Plaintiff's decreased hearing issues and *Plaintiff's* assessment that he was prescribed a hearing aid "because of [his] hearing loss from the tray," that's all they do. [*Id.* at p. 44:3–4]. They do not reflect any indication or medical conclusion by an appropriate medical professional verifying that his hearing loss was *attributable* to the almost 34-hour delay of medical treatment. In other words, the medical files—as they are submitted in the record—do not connect Plaintiff's loss of hearing to Defendant Saldana's refusal to take him to medical immediately after the incident with Torres. Absent the verifying evidence that is required in the Eleventh Circuit to show a worsened condition, the magistrate judge correctly concluded that Plaintiff cannot show that he suffered hearing loss because of the delay in medical treatment. *Hinson*, 927 F.3d at 1123; *Goebert*, 510 F.3d at 1327. Since the magistrate judge's analysis and conclusion on Defendant Saldana's exacerbation argument is undeniably correct, the Court **ADOPTS** that portion of the R&R but not to

the extent it is the only reason by which the Court disposes of the medical needs claim. [Doc. 88, pp. 8–10].

However, it is because the Eleventh Circuit recognizes that "[a] prison guard's intentional denial or delay of medical care" "no matter how brief" "is evidence of deliberate indifference[,]" the Court must modify the magistrate judge's R&R. *Brown*, 894 F.2d at 1538 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This brings us to the crux of what Plaintiff ardently presses as his medical needs claim: the almost 34-hour window during which he unnecessarily endured pain. *See* [Doc. 87, pp. 4–6 (discussing cases finding violations of the Eighth Amendment for failure to treat an inmate's pain)]. Even when medical care is ultimately provided, as was in this case, a prison official may nonetheless act with deliberate indifference by delaying treatment of serious medical needs. *Harris v. Coweta Cnty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) (citing *Brown*, 894 F.2d at 1537) (delay in treatment of serious and painful injuries clearly recognized as rising to level of constitutional claim).

Plaintiff submits that "[t]here are numerous cases" holding that "delaying medical treatment is tantamount to 'unnecessary and wanton infliction of pain.'" [*Id.* at p. 4 (quoting *Brown*, 894 F.2d at 1537–38)]; *Hill*, 40 F.3d at 1187 ("Delay in access to medical attention can violate the Eighth Amendment[.]"). In fact, as Plaintiff points out, the Eleventh Circuit has recognized that under the right conditions, a delay as short as two and a half hours creates an actionable Eighth Amendment claim. *Aldridge v.*

*Montgomery*, 753 F.2d 970, 972–73 (11th Cir. 1985) (two-and-a-half-hour delay in treatment for a bleeding cut under the eye held actionable); [Doc. 87, pp. 4–6].

Most pertinent to Plaintiff's medical needs claim though is that Defendant Saldana testified at his deposition that Plaintiff didn't even ask to be taken to medical. [Doc. 80-4, pp. 19:25—20:10]. Plaintiff, on the other hand, testified via a sworn statement that Defendant Saldana told him that he was "not going to medical because it is too much paperwork." [Doc. 83-2, Boddie Aff., ¶ 6]. Additionally, by Plaintiff's account, Defendant Saldana came into Plaintiff's cell after he had been hit with the tray and saw that part of his ear was bleeding. [*Id.* at ¶ 3]. Conversely, Defendant Saldana, testified that Plaintiff wasn't bleeding. [Doc. 80-4, Saldana Depo., p. 49:12–13]. Putting Plaintiff's hearsay hurdle to the side when it comes to Defendant Saldana's *reason* for not taking Plaintiff to medical, the evidence produces "competing narratives . . . on key events[.]" *Sconiers*, 946 F.3d at 1263. And when competing narratives emerge, "courts are not at liberty to pick which side they think is more credible." *Id.* So, in drawing all justifiable inferences in Plaintiff's favor, the Court will accept that Plaintiff asked to go to medical because he was bleeding. *Id.; see also Anderson*, 477 U.S. at 255.

The delay in this case is admittedly long—approximately 34 hours, and while prisoners should never suffer in pain because taking an inmate to medical may require "too much paperwork," it cannot be overlooked that an inmate's untreated injury or condition must first "qualify as a 'serious medical need.'" *Hinson*, 927 F.3d at 1122;

[Boddie Aff., Doc. 83-2, ¶ 6]. "The essential test is one of medical necessity and not one simply of desirability." *Collins v. Bates*, No. 2:14-CV-231-WHA, 2017 WL 4054160, at *11 (M.D. Ala. Aug. 4, 2017) (quoting *Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. 1981)).

On that note, even though the magistrate judge concedes that a reasonable jury could find that Defendant Saldana was subjectively aware of a serious medical need, the Court, as discussed below, hesitates to make that same concession. [Doc. 88, p. 10]. Yes, when viewing the facts in the light most favorable to Plaintiff, it's accepted as fact that Defendant Saldana saw Plaintiff with a bleeding ear coupled with other injuries one would expect from a common fight. However, a bleeding ear without detail that it was a severe cut or profusely bleeding is not in the class of injuries for which a delay in treatment sounds a constitutional alarm.[13] *See Alsobrook*, *infra*.

When he analyzed Defendant Saldana's exacerbation argument, the magistrate judge essentially "gave" Plaintiff the first two of the three burdens he must shoulder. [Doc. 88, p. 10]. On this record, however, the analysis should have stopped at the first burden. In short, based alone on how Plaintiff described his injuries, the Court doesn't agree that Plaintiff could show an objectively serious medical need of which Defendant Saldana was subjectively aware and disregarded. *Goebert*, 510 F.3d at 1326. The

---

[13] *See, e.g., Brown*, 894 F.2d at 1538–39 (finding summary judgment inappropriate for an unexplained six-hour delay for a broken foot); *Bozeman v. Orum*, 422 F.3d 1265, 1273–72 (11th Cir. 2005) (affirming denial of summary judgment for an unexplained 14-minute delay in medical treatment for a non-breathing prisoner); *Aldridge*, 753 F.2d at 972–93 (a freely-bleeding cut creating a pool of blood on the ground that *required stitches* presented a serious medical need); *Goebert*, 510 F.3d at 1329–31 (prison official not entitled to qualified immunity for ignoring a detainee's alerts of her miscarriage).

magistrate judge used *Hinson* to sever Plaintiff's medical needs claim at causation based on the correct conclusion that the delay in medical treatment didn't worsen Plaintiff's condition or cause his hearing loss. 927 F.3d at 1122–23. But, as discussed above, the Plaintiff presses whether Defendant Saldana's failure to "promptly or adequately" treat Plaintiff's pain makes him liable. *McElligott v. Foley*, 182 F.3d 1248, 1255–59 (11th Cir. 1999). For this reason, the Court **MODIFIES** the magistrate judge's R&R as follows.

The Court begins with *Taylor v. Blue*, 824 F. App'x 994 (11th Cir. 2020). There, the Eleventh Circuit affirmed a denial of qualified immunity where jail guards ignored a detainee's "pleas for help and cries of pain" because "even a lay person would recognize [the] need for medical attention." *Id.* at 995. Expounding on its ruling, the Eleventh Circuit reiterated the well-established precedent that a few hours of delay in treating "serious and painful injuries like broken bones may amount to deliberate indifference" and that deliberate indifference may be found when a prison official doesn't take "any steps to actually secure immediate medical attention" for a prisoner "whose need for prompt treatment appear[s] dire." *Id.* Because of the "dire," "serious," and "painful" injuries described in *Taylor*, the Eleventh Circuit cautioned that "[c]hoosing to deliberately disregard, without any investigation or inquiry, everything an inmate says amounts to willful blindness." *Id.* at 995–96. Again though, the medical need has to be "serious."

Yes, Plaintiff's Complaint, as mentioned above, alleges that he "suffer[ed] in unnecessary pain from his injuries," but he produces no evidence that could lead a reasonable jury to find that his injuries were objectively serious. [Doc. 1, p. 8]. Notwithstanding this lack of evidence, there is no indication that Plaintiff ever told Defendant Saldana that he was in any pain at all—much less "significant," "dire," or "life-threatening" pain. Although Plaintiff's pain allegation may be sufficient under federal pleading standards to survive frivolity review or a motion to dismiss, such skeletal details are insufficient to overcome summary judgment where he (as the nonmovant) must produce "relevant and admissible evidence beyond the pleadings." *Josendis*, 662 F.3d at 1315 (citing *Celotex*, 477 U.S. at 324). At this juncture, his Complaint cannot carry the day; he has to provide admissible evidence.

With regards to whether Plaintiff's injuries were "serious," he cites to *Alsobrook v. Alvarado*, 656 F. App'x 489, 497 (11th Cir. 2016). [Doc. 87, p. 4]; [Doc. 90-1, p. 13]. In that case, the Eleventh Circuit saw "no meaningful distinction" between the injuries in *Aldridge* that "ultimately needed stitches" and Alsobrook's injuries that—like Plaintiff's—only needed Motrin. *Alsobrook*, 656 F. App'x at 496; *Aldridge*, 753 F.2d at 971–73. In both *Aldridge* and *Alsobrook*, the Eleventh Circuit noted that the plaintiffs "suffered wounds that bled profusely[.]" *Alsobrook*, 656 F. App'x at 496. The severity of the wounds described in *Aldridge* and *Alsobrook* provide a key distinction. Not only is there no evidence that Plaintiff was bleeding "profusely" after the incident with Torres,

the evidence regarding how much blood we're dealing with *in this case* shows the opposite. In *Alsobrook*, the plaintiff "had . . . blood covering 70% of the front of [his] t-shirt." *Id*. at 492 (second alteration in original). Here, Plaintiff testified in his deposition that there "wasn't much blood on [his] clothes." [Doc. 80-3, Boddie Depo., p. 66:13–15]. This key distinction provides sufficient basis to move Plaintiff's injuries from the "serious" to the "non-serious" category. It simply can't be true that in every prison fight where an inmate experiences some pain and bleeding, a responding prison official must automatically consider those injuries as "serious" for Eighth Amendment purposes.

Moreover, with regards to "pain," Plaintiff's deposition only mentions the word six times, the first of which concerns headache pain for a previous sick call that was completely unrelated to the incident with Torres. [Doc. 80-3, Boddie Depo., p. 41:19–25]. The other five discuss the "pain medication" or "pain medicine" he was given *for* the incident with Torres. [*Id.* at pp. 42:4–22, 28 (*see* "pain")]. Plaintiff's sworn statement never mentions pain at all. *See generally* [Doc. 83-2]. Instead, within that statement, Plaintiff only says that "[a]fter . . . Torres attacked me, [Defendant] Saldana came into my cell. [Defendant Saldana] looked at me[,] and he could see the swelling on my head and the part of my ear which [*sic*] was bleeding." [*Id.* at ¶ 3]. It was then Plaintiff told Defendant Saldana he "needed to go to medical for treatment because of [his] injury." [*Id.* at ¶ 4]. This, ostensibly provides the sole factual basis for Plaintiff's argument that Defendant Saldana subjectively knew of an objectively serious medical need requiring

treatment because "[a]nyone can tell if [a person] has been hit over the head he needs to be treated in some way." [Doc. 87, p. 3]; *see also Mann*, 588 F.3d at 1307 (stating that a "serious medical need" can be defined as "one that is so obvious that a lay person would recognize the need for medical treatment[]").

That said, let's break down the events of that morning. After the incident, Defendant Saldana took Torres to medical at 4:10 a.m. [Doc. 80-4, Saldana Depo., p. 17:23–25]; [Doc. 83-3, p. 2]. Defendant Saldana returned 50 minutes later. [Doc. 83-3, p. 2]. Defendant Saldana finished his shift at 6:00 a.m. [Doc. 80-4, Saldana Depo., p. 45:14–19]. Plaintiff testified that he didn't see Defendant Saldana after he returned from taking Torres to medical. *See* [Doc. 80-3, Boddie Depo., p. 64:11–15] *in connection with* [Doc. 80-4, Saldana Depo., p. 17:23–25]. Then, around 10:00 a.m., prison officials moved Plaintiff to another cell. [Doc. 80-3, Boddie Depo., p. 65:14–20].

During Plaintiff's deposition, he was specifically asked to describe what he looked like following the incident with Torres. [Doc. 80-3, Boddie Depo., p. 65:11–17]. In response to that question, Plaintiff said:

> You know, I had cleaned myself up and got blood off my face. It was probably like 10:00 []. . . . But I had cleaned my face up, you know, stopped the bleeding kind of. . . . Kind of had bruises, cuts. . . . Like little lacerations[] . . . [o]n my face and on my ear [*sic*] was still bleeding and that's it. There was no major cuts but my nose had stopped bleeding."

[*Id.* at pp. 65:18—66:9]. This description though, portrays how Plaintiff looked at 10:00 a.m. when he was moved to a different cell. It tells us nothing about how Plaintiff

looked when *Defendant Saldana* saw him while he was taking Torres to medical just after the incident.

When Defendant Saldana observed Plaintiff on the way to take Torres to medical, Defendant Saldana testified that Plaintiff was not bleeding, didn't have any bruises, and by all accounts "looked normal." [Doc. 80-4, Saldana Depo., pp. 27:13–16, 49:12–13]. This, of course, is where we have the conflicting narrative mentioned above. Again, by Plaintiff's account, Defendant Saldana looked at him and could see the swelling on his head and the part of his ear that was bleeding. [Doc. 83-2, Boddie Aff., ¶ 3]. Speculation concerns aside, when the Court follows *Sconiers* and *Anderson*, all it has, factually, for this pivotal moment is a visibly swollen head and a bleeding ear. *Sconiers*, 946 F.3d at 1263; *Anderson*, 477 U.S. at 255.

These injuries, however, are representative of the types of claims that several courts have found are not considered to be objectively serious medical needs pursuant to Eighth Amendment case law. *See, e.g.*, *Cooley v. Streeter*, No. 1:18-00540-JB-N, 2020 WL 4211287, at *10 (S.D. Ala. May 19, 2020) (citing *Fernandez v. Metro Dade Police Dep't*, 397 F. App'x 507, 513–14 (11th Cir. 2010)). Even though Plaintiff's non-serious injuries may have left him with some level of pain, Defendant Saldana's "failure to alleviate" that pain immediately after the incident, "while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Collins v. Bates*. No. 2:14-CV-231-WHA, 2017 WL 4054160, at *6 (M.D. Ala. Aug. 4, 2017) (quoting *Farmer*, 511

U.S. at 838). To hold otherwise would imply that prison officials violate the Constitution every single time a prisoner complains of pain that can be treated by a "little ointment cream" or some Motrin but isn't immediately taken to medical to get it. [Doc. 80-3, Boddie Depo., p. 67:7–8], [Doc. 83-4, pp. 1, 10]. Because it has long been established that "delay or even denial of medical treatment for superficial, non[-]serious physical conditions does not constitute an Eighth Amendment violation[,]" Plaintiff's medical needs claim fails. *Hill*, 40 F.3d at 1187.

In modifying the magistrate judge's R&R, the Court concludes that Plaintiff has failed to present evidence showing an objectively *serious* medical need. *See Goebert*, 510 F.3d at 1326. As such, Plaintiff's deliberate indifference to a serious medical needs claim should have been resolved at the first burden, not the third. *Hinson*, 927 F.3d at 1122. Because the record does not show an objectively serious medical need, Plaintiff has not suffered a violation of his Eighth Amendment right to be free from deliberate indifference, and Defendant Saldana is entitled to qualified immunity on Plaintiff's medical needs claim as well.

### D.    <u>Conclusion</u>

After a de novo review of the record, the Court **ADOPTS** the United States Magistrate Judge's Report and Recommendation [Doc. 88] with respect to Plaintiff's

failure-to-protect claims and **MAKES IT THE ORDER OF THE COURT**.[14] The portion

of the Report and Recommendation regarding Plaintiff's deliberate indifference to

serious medical needs claim, however, is **ADOPTED** and **MODIFIED**. Thus, based on

the Court's analysis concerning Plaintiff's pain-based arguments, the Court must still

**GRANT** Defendants' Motion for Summary Judgment [Doc. 80]. The Clerk of Court is

**DIRECTED** to enter **JUDGMENT** in favor of Defendants Officer David Saldana and

Sergeant Philip Williamson.

      **SO ORDERED**, this 30th day of June, 2021.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[14] While not explicitly discussed in this Order, the Court also adopts the magistrate judge's R&R with respect to his recommendation regarding Plaintiff's exhaustion of his administrative remedies as an alternative basis for granting summary judgment to Defendants on Plaintiff's failure-to-protect claim. [Doc. 80, pp. 11–15].